# United States Court of Appeals for the Federal Circuit

---

**CALLAN CAMPBELL, JAMES H. CHADWICK, JUDITH STRODE CHADWICK, KEVIN C. CHADWICK, INDIVIDUALLY AND THROUGH HIS COURT-APPOINTED ADMINISTRATORS, JAMES H. CHADWICK AND JUDITH STRODE CHADWICK, KEVIN JUNSO, NIKI JUNSO, TYLER JUNSO ESTATE, THROUGH KEVIN JUNSO, ITS PERSONAL REPRESENTATIVE,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2018-2014

---

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00717-PEC, Judge Patricia E. Campbell-Smith.

---

Decided: August 1, 2019

---

STEVEN R. JAKUBOWSKI, Robbins Salomon & Patt, Ltd., Chicago, IL, argued for plaintiffs-appellants.

JOHN JACOB TODOR, Commercial Litigation Branch, Civil Division, United States Department of Justice,

Washington, DC, argued for defendant-appellee. Also represented by JOSEPH H. HUNT, ROBERT EDWARD KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

_____

Before NEWMAN, LOURIE, and DYK, *Circuit Judges.*

DYK, *Circuit Judge.*

This case arises out of the 2009 bankruptcy of General Motors Corporation ("Old GM").[1] The plaintiffs compose a putative class of individuals who had asserted personal injury claims against Old GM, and whose successor liability claims were extinguished during bankruptcy. Relying on our decision in *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142 (Fed. Cir. 2014), the plaintiffs sued the United States on behalf of themselves and others similarly situated in the Court of Federal Claims ("Claims Court"), alleging that the extinguishment of their claims without just compensation violated the Takings Clause of the Fifth Amendment. The Claims Court dismissed the plaintiffs' claims, concluding that they were barred by the statute of limitations and that the plaintiffs had, in any event, failed to state a claim. Because we hold, as to the claims alleging coercion of Old GM, that the statute of limitations had run when the plaintiffs filed their complaint and, with respect to the plaintiffs' other claims, that the Claims Court also lacks jurisdiction, we affirm.

BACKGROUND

I

In *A & D*, a group of former automobile dealerships sued the United States, raising Fifth Amendment takings claims based on the extinguishment of the plaintiffs'

_____

[1] "Old GM" refers to the GM entity in existence prior to the sale of assets pursuant to 11 U.S.C. § 363.

franchise agreements with Old GM in a bankruptcy sale pursuant to 11 U.S.C. § 363. 748 F.3d at 1147. That section gives a bankruptcy trustee the power to use, sell, or lease the property of a debtor in bankruptcy. In particular, § 363(f) (the provision at issue here) provides that "[t]he trustee may sell property . . . free and clear of any interest in such property of an entity other than the estate" under certain conditions. 11 U.S.C. § 363(f) (emphasis added).

In *A & D*, the plaintiffs alleged that the government had conditioned its continued financial assistance to Old GM on the company's submission for approval of a proposed sale order that terminated the plaintiffs' franchise agreements. 748 F.3d at 1148. The plaintiffs contended that this purported coercion effected a regulatory taking under the Fifth Amendment. *Id.* at 1149. The Claims Court denied the government's motion to dismiss for failure to state a claim but certified the case for interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(2). *Id.* at 1150.

On appeal, we held that the government may, in some circumstances, be liable for a regulatory taking of property where the government pressures a third party (there, allegedly Old GM) to take an "action that affects or eliminates the property rights of the plaintiff." *Id.* at 1153. We determined that such conduct may give rise to a taking where the government's action was "direct and intended" and where the "the third party is acting as the government's agent or the government's influence over the third party was coercive rather than merely persuasive." *Id.* at 1154. We did not decide whether the government's actions with respect to Old GM were coercive or otherwise satisfied the conditions for takings liability.[2] *Id.* at 1155–56. We

---

[2]    Even if coercion had been established, that would merely make the third party's action the equivalent of government action. The plaintiffs would still be required to engage in the *Penn Central* analysis and to establish a

explained that to state a claim, the plaintiffs needed to have pled that their "property suffered a diminution in value or a deprivation of economically beneficial use" as a result of the government's action. *Id.* at 1157. We determined that the plaintiffs' allegations were insufficient to show that their franchise agreements had value absent the government action and remanded to the Claims Court to permit the plaintiffs to amend their complaint "to include specific allegations establishing loss of value" and thereafter to determine whether a compensable taking had occurred. *Id.* at 1158–59.

## II

Relying on *A & D*, on July 9, 2015, the plaintiffs here sued the government in the Claims Court alleging that the government had coerced Old GM to include in its proposed bankruptcy sale order provisions extinguishing the plaintiffs' property interests pursuant to § 363 of the Bankruptcy Code.

The plaintiffs are a group of individuals who alleged that they are victims of accidents involving GM vehicles (or are the family members or estates of such individuals), and had personal injury claims against Old GM. The plaintiffs alleged that under Michigan law they possessed successor liability claims at the time the § 363 sale closed. Michigan law provides that where there is a sale of assets from one entity to another such that there exists "a continuity of enterprise between a successor and its predecessor[,] . . . a successor [may be forced] to 'accept the liability with the benefits' of such continuity." *Foster v. Cone-Blanchard Mach. Co.*, 597 N.W.2d 506, 510 (Mich. 1999) (quoting *Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873, 883 (Mich. 1976)).

---

diminution in the value of their property. *See Penn. Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978).

Under Michigan law,

> a prima facie case of continuity of enterprise exists where the plaintiff establishes the following facts: (1) there is continuation of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations of the predecessor corporation; (2) the predecessor corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and (3) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the selling corporation.

*Id.* The plaintiffs' complaint here sets out facts supporting each of these factors. Though the government disputes whether the plaintiffs' successor liability claims constitute a cognizable property interest for the purposes of a Fifth Amendment taking, we assume, without deciding, that they do.

Here, Old GM filed for bankruptcy on June 1, 2009, and filed a motion seeking court approval to sell substantially all its assets to a new corporation, referred to as "New GM," pursuant to 11 U.S.C. § 363. *In re Gen. Motors Corp.*, 407 B.R. 463, 479–80, 483 (Bankr. S.D.N.Y. 2009). To facilitate the sale, the government provided financing to Old GM for the bankruptcy and the company's ongoing operations. *See id.* at 473, 479. In return, the government received $8.8 billion in debt and preferred stock of New GM and approximately 60 percent of its equity. *Id.* at 482. According to the bankruptcy court, without the government's financing, Old GM would have "face[d] immediate liquidation." *Id.* at 484. According to the plaintiffs' complaint, "on the eve of Old GM's bankruptcy filing, the [g]overnment . . . condition[ed] the closing of the [s]ale on the . . . inclusion of . . .

provision[s]" concerning successor liability.[3]  J.A. 1037; *see also* Appellant Br. 8.

Because of the government's insistence, according to the complaint, the proposed sale order thus included "a number of provisions making explicit findings that New GM is not subject to [the plaintiffs'] successor liability [claims]." *Gen. Motors Corp.*, 407 B.R. at 500.  Those provisions provide, in relevant part:

> Except for the Assumed Liabilities, . . . the Purchased Assets shall be transferred to the Purchaser . . . free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever . . . <u>including rights or claims based on any successor or transferee liability</u> . . . .
>
> [A]ll persons and entities . . . holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, <u>including rights or claims based on any successor or transferee liability,</u> . . . <u>are forever barred, estopped, and permanently enjoined</u> . . . .

J.A. 449–50, ¶¶ 7, 8 (emphases added).  Allegedly, the government's financing was "expressly conditioned upon approval of this motion [seeking approval of the proposed sale order] by July 10." *Gen. Motors Corp.*, 407 B.R. at 484.

The bankruptcy court approved Old GM's proposed sale order on July 5, 2009, and "permit[ted] GM's assets to pass . . . free and clear of successor liability claims." *Id.* at 505.  The court determined that it would not "gamble on the notion that the U.S. Government didn't mean it when it said that it would not keep funding GM." *Id.* at 493.  In

---

[3]    This is somewhat inconsistent with other allegations of the complaint stating that extinguishment of the plaintiffs' claims was not important to the government.

approving the sale, the court explained that "GM is hopelessly insolvent" and that "if GM liquidates, there will . . . be nothing for stockholders . . . [or] unsecured creditors." *Id.* at 520.

Paragraph 70 of the sale order provided that the order "shall be effective as of 12:00 noon, EDT, on Thursday, July 9, 2009." J.A. 475. The § 363 sale closed thereafter on July 10, 2009.

## III

The plaintiffs appealed the bankruptcy court's order to the United States District Court for the Southern District of New York. *See In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010). Somewhat confusingly, the district court both affirmed the bankruptcy court's decision and determined that the appeal was moot. *Id.* at 64. Because the plaintiffs had failed to seek a stay of the § 363 sale pending appeal, and the § 363 sale had closed, the court concluded that the plaintiffs' appeal was statutorily moot under § 363(m) of the Bankruptcy Code. *Id.* at 56–60. The court entered an order stating that "the appeal is denied as moot, and the judgment of the Bankruptcy Court is AFFIRMED." *Id.* at 64. Though the district court explained that it was "not unsympathetic to the plight of the [plaintiffs]," it noted that the plaintiffs' "position in the bankruptcy appears to be neither better not worse than that of any other unsecured contingent creditor." *Id.* at 63. The district court concluded that had the § 363 sale not occurred, Old GM would have proceeded to liquidation and the plaintiffs "and other unsecured creditors would have received nothing." *Id.* at 63–64.

## IV

The Claims Court dismissed the plaintiffs' complaint on October 30, 2017, without deciding the question of whether the alleged class should be certified. The court held that the plaintiffs' complaint was not timely because

it was not filed within the Tucker Act's six-year statute of limitations.  In reaching this conclusion, the court stated that "[t]he complaint's specific references to government coercive action . . . all point to activity that predates the Sale Order issued by the bankruptcy court."  J.A. 7.  In other words, the court determined that the plaintiffs' takings claim had accrued, at the latest, on July 5, 2009—more than six years before the date on which the plaintiffs filed their complaint in the Claims Court.

In the alternative, the Claims Court held that dismissal was proper because the plaintiffs had failed to identify a cognizable property interest.  It characterized the plaintiffs' successor liability claims as being "too contingent" to compose a property interest that would be subject to a compensable taking under the Fifth Amendment.  J.A. 18  The court explained that the plaintiffs' purported property interests were "entirely contingent upon two discretionary acts of the federal government: (1) a government financial intervention so that a New GM could be created; and[] (2) a government intervention so that Old GM could file for bankruptcy requesting a 363 sale."  J.A. 18.  The Claims Court also concluded that the plaintiffs lacked a cognizable property interest because § 363 predated the creation of the plaintiffs' purported property interests (the successor liability claims) and therefore that the possibility of extinguishment in bankruptcy "inhered" in the title to the plaintiffs' claims.  J.A. 22.  The court did not reach the question of whether the plaintiffs had sufficiently alleged a diminution in the value of their property as a result of the government's action.

On November 27, 2017, the plaintiffs filed in the Claims Court a combined motion for reconsideration, motion to amend the judgment, and motion for leave to file a second amended complaint.  The proposed second amended complaint, in the words of the Claims Court, "reshaped[d] the description of plaintiffs' takings claims and the facts already alleged" and contained additional factual

allegations. J.A. 24. The plaintiffs added facts purporting to demonstrate that government coercion continued after the bankruptcy court entered the § 363 sale order. The plaintiffs' complaint essentially added more detail about the government's claimed pressure on the bankruptcy court and the district court. The Claims Court considered the alleged facts presented in the plaintiffs' second amended complaint but determined that the revised allegations were insufficient to change the result and denied the motion, reaffirming both of its initial grounds for dismissing the plaintiffs' complaint.

The plaintiffs appealed to this court.[4] We have jurisdiction under 28 U.S.C. § 1295(a)(3). We review the Claims Court's decision to dismiss for lack of jurisdiction de novo. *Diaz v. United States*, 853 F.3d 1355, 1357 (Fed. Cir. 2017).

DISCUSSION

I

We agree with the Claims Court that the plaintiffs' complaint was untimely insofar as the complaint alleged coercion of Old GM. The Tucker Act's statute of limitations provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. The Supreme Court has held that the Claims Court's six-year statute of limitations is jurisdictional. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008).

The plaintiffs here filed their complaint alleging Fifth Amendment takings claims in the trial court on July 9,

---

[4] We note that the government's brief before this court does not comply with Federal Rule of Appellate Procedure 32(a)(1)(A) because it was filed double-, rather than single-sided.

2015.  The question is when the alleged taking occurred. The plaintiffs alleged in their complaint, and reaffirmed during oral argument, that the primary conduct which caused the taking was the government's coercion of Old GM to secure approval from the bankruptcy court of a proposed sale order extinguishing the plaintiffs' successor liability claims.  Specifically, the plaintiffs alleged that the government "directed" that the sale order "exclude all Personal Injury Products Liability Claims."  J.A. 398, ¶ 83.  In other words, that the government "condition[ed] the closing of the Sale on inclusion of a provision within the Sale Order that expressly extinguished the rights of any Personal Injury Claimant to assert successor liability claims against New GM."  J.A. 403, ¶ 107.  The plaintiffs contended that Old GM was "[l]eft with no option but to comply with the [g]overnment's mandate or face certain liquidation," and Old GM consequently filed for bankruptcy and submitted to the bankruptcy court a proposed sale order that "left behind the [plaintiffs'] Personal Injury Products Liability Claims."  J.A. 399–400, ¶¶ 88, 98.  In light of these allegations, we focus our accrual analysis on the government's alleged coercion of Old GM.

The parties present three possible dates on which the plaintiffs' takings claims may have accrued.  The government argues that the claims accrued at least on July 5, 2009, when the bankruptcy court approved and entered the sale order ("Entry Date").  The plaintiffs argue to the contrary that their claims did not accrue until either July 9, 2009, the date on which the § 363 sale became effective ("Effective Date"), or July 10, 2009, the date on which the § 363 sale closed ("Closing Date").  The plaintiffs contend that the Entry Date cannot constitute the date on which their claims accrued because the value of the plaintiffs' successor liability claims had not yet been extinguished as of July 5, 2009.  We conclude that under the plaintiffs' theory as to the coercion of Old GM, the alleged taking occurred

on July 1, 2009—when Old GM filed the proposed sale order with the bankruptcy court.

The standards for claim accrual in physical takings and regulatory takings cases are distinct, and this distinction is important. As the Supreme Court has held, "it [is] inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking', and vice versa." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323 (2002) (footnote omitted).

In the case of a physical taking, claim accrual is relatively simple to pinpoint. "A physical taking generally occurs when the government directly appropriates private property or engages in the functional equivalent of a 'practical ouster of [the owner's] possession.'" *Katzin v. United States*, 908 F.3d 1350, 1361 (Fed. Cir. 2018) (alteration in original) (quoting *Washoe Cty. v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003)); *see United States v. Dow*, 357 U.S. 17, 24–25 (1958) (occupation of property signaled claim accrual, not the later transfer of a deed). For example, in *Casitas Municipal Water District v. United States*, 708 F.3d 1340 (Fed. Cir. 2013), this court held that the plaintiffs' physical takings claim had accrued not when the National Marine Fisheries Service issued an opinion, which, if followed, would have resulted in the diversion of some of the plaintiffs' water, but rather whenever an actual diversion of water occurred. *Id.* at 1358–59; *see also Nw. La. Fish & Game Pres. Comm'n v. United States*, 446 F.3d 1285, 1290–91 (Fed. Cir. 2006) (where the damage of a purported physical taking occurs by a continuing process of physical events, the damages must be "quantifiable and present").

In the case of a regulatory taking, however, the taking may occur before the effect of the regulatory action is felt and actual damage to the property interest is entirely determinable. As the Supreme Court recently stated in a

regulatory takings case, "a property owner has a claim for a violation of the Takings Clause as soon as [the] government takes his property for public use without paying for it" without regard to post-taking remedies that may be available. *Knick v. Township of Scott*, 139 S. Ct. 2162, 2170 (2019). In other words, "because a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit at that time." *Id.* at 2172. For example, in *Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995), a bankruptcy trustee challenged the FDIC's assessment of liability and consequent seizure of a bank's assets pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act. *Id.* at 1574. This court held that "[t]he seizure and closure of [a] bank, once the bank became insolvent, did not constitute a taking." *Id.* at 1575. Rather, it was the "FDIC's assessment of liability," which directly caused the insolvency, that was the purported taking and therefore marked the date of accrual. *Id.*

In *Goodrich v. United States*, 434 F.3d 1329 (Fed. Cir. 2006), a regulatory takings case, the question was whether the issuance of a Forest Service Record of Decision ("ROD") and a final Environmental Impact Statement ("EIS") resulted in accrual of the plaintiff's takings claim. *Id.* at 1331. We held that it did. We determined that the ROD and final EIS were sufficiently final to accrue takings liability because they "are final agency statements of official position that are published [by the agency] only after years of analysis and consultation with affected parties." *Id.* at 1335. We explained that the claim accrues when the agency action is complete, "regardless of whether damages are 'complete and fully calculable.'" *Id.* at 1336 (quoting *Fallini v. United States*, 56 F.3d 1378, 1382–83 (Fed. Cir. 1995)). Here, assuming that the plaintiffs' claims had value in the first place, despite the likelihood of no recovery if Old GM had liquidated, the filing of the proposed

bankruptcy sale order clearly inflicted an injury on the plaintiffs by diminishing the value of their claimed property rights.

Notably, the court in *Goodrich* made clear that where a regulatory taking is alleged, it is the final decision of the government actor alleged to have caused the taking that triggers accrual of a takings claim, not the ultimate impact of that decision. In *Goodrich*, though "it took the Forest Service over three years to implement [the ROD] transferring Kennedy's cattle to the Whitetail Allotment"—i.e., for the government's decision to be implemented—the court nevertheless determined that the issuance of the ROD, rather than the physical appropriation by cattle of water was "a better place to deem any taking occurred." *Id.*

The plaintiffs argue that the government's pressure of Old GM was not complete (that is, not "final") at the Entry Date. According to the plaintiffs, the government could have changed its mind regarding the plaintiffs' successor liability claims at any point before the § 363 sale closed on July 10, 2009. But the plaintiffs do not cite any authority in support of their theory that a government actor's ability to change its mind prevents claim accrual. To the contrary, in *Ladd v. United States*, 630 F.3d 1015, 1023–24 (Fed. Cir. 2010); *Barclay v. United States*, 443 F.3d 1368, 1378 (Fed. Cir. 2006), *cert. denied*, 549 U.S. 1209 (2007); and *Caldwell v. United States*, 391 F.3d 1226, 1234–35 (Fed. Cir. 2004), *cert. denied*, 546 U.S. 826 (2005), in the context of an alleged physical taking effected by an action taken pursuant to the National Trail Systems Act, we held that the government's issuance of Notices of Interim Trail Use or Abandonment ("NITUs") effected a taking even though the NITUs could have been vacated by the agency or set aside by a court.

Similarly, in *Cuban Truck & Equipment Co. v. United States*, 333 F.2d 873 (Ct. Cl. 1964), our predecessor court rejected a somewhat similar theory. There the plaintiffs

asserted a takings claim seeking compensation for the value of certain vehicles. *Id.* at 875. The alleged taking was effected when the German government (at the insistence of the United States) directed a quasi-public company in possession of the vehicles to "exclude from sale or delivery [those vehicles] at its depots" ("the freeze"). *Id.* at 878 (footnote omitted). The takings claim was held to accrue on the date of the freeze. The plaintiffs argued for a later accrual date because the German government could have unilaterally decided to lift the freeze. *Id.* at 879. Our predecessor court held that this possibility did not impact the date of accrual. *Id.* Though *Ladd*, *Barclay*, *Caldwell*, and *Cuban Truck* are physical takings cases, we conclude that their reasoning is equally applicable in the regulatory takings context. The possibility that the government or a third party would change its mind does not affect the date on which the plaintiffs' takings claims accrued.

Such a takings theory, moreover, would be unworkable. Agencies generally have broad power to reconsider their decisions. *Medtronic, Inc. v. Robert Bosch Healthcare Sys., Inc.*, 839 F.3d 1382, 1385 (Fed. Cir. 2016). Thus, determining accrual based on the possibility the government actor would change its mind would make the date of accrual entirely indeterminate in many situations.

The plaintiffs also contend that the Entry Date cannot serve as the date of accrual because the order "could have been overturned in advance of the 'Effective Date' by a 'higher body' (*i.e.*, the District Court at the July 9, 2009 hearing on whether to stay the effectiveness of the Sale Order[)]." Appellant Br. 23. We disagree. This argument ignores the fact that the government action purported to have effected a taking is the government's coercion of Old GM, not the bankruptcy court's order. Any action by the bankruptcy court or any higher judicial body merely goes to the ultimate effect of the alleged government taking. Such collateral action does not alter the finality of the government's action for the purpose of accrual of a takings

claim. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001) ("The central question in resolving the ripeness issue . . . is whether petitioner obtained a final decision from the [government] determining the permitted use for the land."); *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985) ("[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."). As the Supreme Court in *Williamson* made clear, "the finality requirement is concerned with whether <u>the initial decisionmaker</u> has arrived at a definitive position on the issue that inflicts an actual, concrete injury."[5] 473 U.S. at 193 (emphasis added).

## II

The plaintiffs also argue that the government effected a taking by pressuring the bankruptcy court and the district court to approve the proposed sale order, citing colorful language from a book by Steve Rattner (the leader of the government team responsible for assessing the viability of Old GM's restructuring plans) that the government's threats were "'the financial equivalent of holding a gun to the head' of the courts." Appellant Br. 5, 12. These actions allegedly occurred during the bankruptcy court's and district court's consideration of the proposed sale order, i.e., within the limitations period. But the coercion that could give rise to a regulatory takings claim does not include "coercion" of the court system by making an argument for a particular result. It is well established that the Claims Court "cannot entertain a taking[s] claim that requires the court to scrutinize the actions of another tribunal." *Petro-*

---

[5] This aspect of *Williamson* remains good law under *Knick*. *See* 138 S. Ct. 2162 (2019).

*Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1386 (Fed. Cir. 2017) (alteration in original) (quoting *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1353 (Fed. Cir. 2015)); *accord Allustiarte v. United States*, 256 F.3d 1349, 1351–52 (Fed. Cir. 2001).

In *Allustiarte*, we considered a similar claim that several plaintiffs had suffered a "taking of their property at the hands of the bankruptcy trustees and courts." 256 F.3d at 1351. We held that the Claims Court lacked jurisdiction over such an action because it "would require the court to scrutinize the actions of the bankruptcy trustees and courts" and we noted that "permit[ting such] collateral attacks on bankruptcy court judgments would 'seriously undercut[ ] the orderly process of the law.'" *Id.* at 1351–52 (second alteration in original) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995)). We explained that "[t]he proper forum for [the plaintiffs'] challenges . . . lies in the Ninth Circuit [the appropriate appellate forum in *Allustiarte*], not the [Claims Court]." *Id.* at 1352.

The same reasoning applies here. The plaintiffs' allegations that the government coerced the bankruptcy court and the district court amount to no more than a mine-run challenge to the bases for those court's decisions regarding the sale order. The supposed coercion here was not extrajudicial, as was the case in *A & D*. The plaintiffs cannot maintain a collateral attack on the decisions of the bankruptcy court and district court on a takings theory. The proper forum for such a challenge is the judicial appellate process.

To the extent that the plaintiffs argue that there was a taking because § 363 did not permit the extinguishment of their successor liability claims, we disagree that this is a cognizable takings action. As we held in *Lion Raisins, Inc. v. United States*, 416 F.3d 1356 (Fed. Cir. 2005), a plaintiff's claim that "it is entitled to prevail because the agency acted in violation of a statute . . . [does] not give the

plaintiff the right to litigate that issue in a takings action rather than in the congressionally mandated . . . review proceeding." *Id.* at 1369 (emphasis omitted) (quoting *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir. 2001)); *see also Petro-Hunt*, 862 F.3d at 1386.[6] We see no difference, in this regard, between a takings claim based on an agency action allegedly in violation of a statute and that of a federal court. Again, the plaintiffs' remedy based on their challenge to the lawfulness of the § 363 sale was to pursue their successor liability claims through the usual

---

[6] We note that the circuits appear to be split on the issue of whether a bankruptcy court has authority to extinguish successor liability claims pursuant to a § 363 sale. *Compare Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545–46 (7th Cir. 2003) (concluding that the "right to possess . . . property as a lessee qualifies as an interest for the purposes of section 363(f)" but limiting the definition of "interest" to include only a "right to the property itself" rather than "a right that is connected to or arising from the property"); and *In re Wolverine Radio Co.*, 930 F.2d 1132, 1147 n.23 (6th Cir. 1991) (questioning whether "general unsecured interests fall within the scope of those interests that can be discharged pursuant to section 363(f)"), *with In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–93 (3d Cir. 2003) (citing 3 Collier on Bankruptcy ¶ 363.06[1]) (holding that a sale free and clear of successor liability claims based on employment discrimination was authorized under § 363); *and In re Leckie Smokeless Coal Co.*, 99 F.3d 575, 581–82 (4th Cir. 1996) (affirming sale free and clear of successor liability for claims under Coal Act). *See generally* Charles Jordan Tabb, Law of Bankruptcy 450–51 (4th ed. 2016) (noting that the "prevailing trend" is that courts find that a § 363 sale can be made free and clear of successor liability claims but that there is no consensus). We need not decide this issue because its outcome does not affect our analysis.

appeal process, as they attempted to do. *See Motors Liquidation Co.*, 428 B.R. 43.

## III

The plaintiffs briefly contend that, at worst, they should now be permitted to amend their complaint to cure any deficiency identified by this court as the plaintiffs in *A & D* were permitted to do. But the plaintiffs here already amended their complaint once as of right and then sought leave to amend their complaint again in conjunction with their motion requesting that the Claims Court reconsider its dismissal of this case. The Claims Court denied the plaintiffs' request to amend their complaint, deeming it futile in attempting to overcome the deficiencies on which the Claims Court's dismissal was based. We agree with the Claims Court and therefore likewise decline the plaintiffs' request to amend. The proposed second amended complaint simply supplies additional detail about the extent and timing of the alleged pressure on the bankruptcy court and district court. There are no new allegations in the proposed second amended complaint that would alter the date of accrual concerning the claim based on coercion of Old GM or that bolster the plaintiffs' theory concerning coercion of the courts.

## CONCLUSION

We conclude that the plaintiffs' takings claims based on the alleged coercion of Old GM accrued when Old GM submitted the proposed sale order to the bankruptcy court on July 1, 2009, and that the plaintiffs' complaint in this respect was untimely because it was filed more than six years after their claims accrued. With respect to the plaintiffs' claims that the government had coerced the bankruptcy court and the district court, we conclude that the plaintiffs' claims are not within the Claims Court's jurisdiction. Under the circumstances, we need not decide the question of whether the plaintiffs have sufficiently alleged

a loss of value of their alleged property interests.  Accordingly, we affirm.

**AFFIRMED**